UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CENTILLION DATA SYSTEMS, LLC, )<br> Plaintiff, )<br> )<br> vs. )<br> )<br>QWEST COMMUNICATIONS )<br>INTERNATIONAL, INC. and QWEST )<br>CORPORATION, )<br> Defendants. ) | 1:04-cv-0073-LJM-DKL |

_____

| | |
|---|---|
| QWEST CORPORATION and QWEST )<br>COMMUNICATIONS CORPORATION, )<br> Consolidated Plaintiffs, )<br> )<br> vs. )<br> )<br>CENTILLION DATA SYSTEMS, LLC )<br>and CTI GROUP (HOLDINGS), INC., )<br> Consolidated Defendants. ) | 1:04-cv-2076<br>(consolidated with above) |

## <u>ORDER</u>

Pending before the Court are two motions for summary judgment ("Motions"):

Plaintiffs Centillion Data Systems, LLC's and CTI Group (Holdings) Inc.'s (collectively,

"Centillion") Motion for Partial Summary Judgment of Infringement [Dkt. No. 871],[1] and

Defendants Qwest Communications International, Inc. and Qwest Corporation, and

Consolidated Plaintiffs Qwest Corporation and Qwest Communications Corporation's

---

[1] Contemporaneously with the Motions, Centillion filed Plaintiffs Centillion Data Systems, LLC's and CTI Group (Holdings), Inc.'s Request for Oral Argument on Their Motion for Partial Summary Judgment of Infringement [Dkt. No. 879]. Subsequently, the request was renewed in Centillion's Renewed Motion for Oral Argument on Motions for Summary Judgment [Dkt. No. 921]. The Court has sufficient information to decide the Motions without oral argument and, therefore, **DENIES** Centillion's requests for oral argument [dkt. nos. 879, 921].
    In addition, following the submission of supplemental authority and briefing on the same, Qwest filed its Motion for Leave to File a Sur-Reply to Centillion's Reply in Support of Its Notice of Supplemental Authority [Dkt. No. 918]. The Court concludes that a surreply is unnecessary given the extensive briefing already file and **DENIES** Qwest's motion [dkt. no. 918].

(collectively, "Qwest") Motion for Summary Judgment of Non-Infringement [Dkt. No. 880]. The Court has considered the parties' arguments and evidence and rules as follows.

## I.  BACKGROUND

On February 15, 1994, the United States Patent and Trademark Office issued United States Patent No. 5,287,270 ("'270 Patent"), titled "Billing System," to Compucom Communications Corporation.  '270 Patent.  Broadly speaking, the '270 Patent allows telephone service providers to provide subscribers with detailed call information that can be easily organized and analyzed.  *Id.*  Following a corporate reorganization, the '270 Patent was transferred to its current owner, Centillion Data Systems, LLC.  Dkt. No. 872 at 4 ¶ 2.

### A.  RELEVANT CLAIMS OF THE '270 PATENT

Centillion accuses Qwest of infringing claims 1, 8, 10, and 46 of the '270 Patent. Dkt. No. 884 at 7 ¶ 2.  Those claims recite:

1.     A system for presenting information concerning the actual cost of a service provided to a user by a service provider, said system comprising:

storage means for storing individual transactions records prepared by said service provider, said transaction records relating to individual service transactions for one or more service customers including said user, and the exact charges actually billed to said user by said service provider for each said service transaction;

data processing means comprising respective computation hardware means and respective software means for directing the activities of said computation hardware means;

means for transferring at least a part of said individual transaction from said storage means to said data processing means;

said data processing means generating preprocessed summary reports as specified by the user from said individual transaction records transferred from said storage means and organizing said summary reports into a format for storage, manipulation and display on a personal computer data processing means;

means for transferring said individual transaction records including said summary reports from said data processing means to said personal computer data processing means; and

said personal computer data processing means being adapted to perform additional processing on said individual transaction records which have been at least in part preprocessed by said data processing means utilizing said summary reports for expedited retrieval of data, to present a subset of said selected records including said exact charges actually billed to said user.

\* \* \*

8.　　A system for presenting, under control of a user, usage and actual cost information relating to telecommunications service provided to said user by a telecommunications service provider, said system comprising:

telecommunications service provider storage means for storing records prepared by a telecommunications service provider relating to telecommunications usage for one or more telecommunications subscribers including said user, and the exact charges actually billed to said user by said service provider for said usage;

data processing means comprising respective computation hardware means and respective software programming means for directing the activities of said computation hardware means;

means for transferring at least a part of the records from said service provider storage means to said data processing means;

said data processing means generating preprocessed summary reports as specified by the user from said telecommunications usage records transferred from said storage means and organizing said summary reports into a format for storage, manipulation and display on a personal computer data processing means;

means for transferring said telecommunications usage records including said summary reports from said data processing means to said personal computer data processing means;

3

said personal computer data processing means being adapted to perform additional processing on said telecommunications records which have been at least in part preprocessed by said data processing means utilizing said summary reports for expedited retrieval of data, to present a subset of said telecommunications usage records including said exact charges actually billed to said user.

\* \* \*

10.    A system as in claim 8 wherein said selected records relating to telecommunications usage and cost comprise at least one telecommunications call detail record corresponding to a unique telecommunications call to be billed to said subscriber, said call having a length determined by said telecommunications carrier.

\* \* \*

46.  A system as in claim 8 wherein an information interchange media means in the form of a data communications line is employed for transferring said selected records from said data processing means to said personal computer data processing means.

'270 Patent col.31 l. 39–col.36 l. 7.

## B.  QWEST'S PRODUCTS

Centillion contends that Qwest infringed the '270 Patent through its Logic, eBill Companion, and Insite products (collectively, "Accused Products").  Centillion moves for summary judgment only as to the eBill Companion ("eBC")[2] application.  Dkt. No. 872 at 12 n.5.

The parties agree that Qwest was aware of the '270 Patent prior to the design and introduction of eBC.  Dkt. No. 883-6 at 7–8.  Qwest contends that it attempted to design around the '270 Patent and, as a result, the Accused Products were "less robust than

_____

[2] Logic is the predecessor system to eBC.  Dkt. No. 828 at 8.  Insite is a product offered to BellSouth customers, and Centillion contends that Insite is functionally identical to both Logic and eBC.  *Id.*

desired." Dkt. No. 884 at 16 ¶ 20. While designing the Accused Products, Qwest's designers purportedly did not seek legal advice as to whether their design effectively designed around the '270 Patent, instead relying on internal discussions among designers. Dkt. No. 886-5 at 4.

Qwest introduced eBC in 2002. Dkt. No. 872-1 at 11. Qwest sends billing information either by CD-ROM or by download to individual customers for use in eBC, although Qwest's customers are not required to process the sent billing information through eBC or any other program provided by Qwest. Dkt. No. 872-10 at 33; *see also Centillion Data Sys. v. Qwest Comm'ns Int'l, Inc.*, 631 F.3d 1279, 1281 (Fed. Cir. 2011). The billing information consists of call detail records ("CDRs") for each discrete call captured by Qwest's telecom switches. Dkt. No. 872 at 13 ¶ 10. The eBC system permits display and billing analysis of long-distance telecommunications usage for particular customers. Dkt. No. 872-10 at 12. Qwest makes eBC available to commercial customers. Dkt. No. 872 at 12 ¶ 6.

To prepare the billing information sent to customers, the CDRs captured through Qwest's telecom switches are processed in the LATIS system—a software application that runs on various servers—where each CDR is rated to include the exact charges actually billed for a given call. Dkt. No. 872 at 13–14 ¶¶ 11, 13. This rating process includes application of various promotional pricing and discounts. *Id.* The rated CDRs are stored in several locations in Qwest's architecture, including the Billing Data Server ("BDS"), which is a hard disk device capable of receiving, retaining, and supplying data. *Id.* at 14 ¶ 12. From the BDS, CDRs are transferred via data communication lines to the eBC Back Office, a software application written in Java and XML, upon request. *Id.* at 14 ¶¶ 13–14.

The eBC Back Office application uses the CDR information to create .TXT files.  Dkt. No. 892 at 4 ¶ 6.  The .TXT files include a collection of all billing records for a given customer.  Information on the .TXT files mirrors that contained in the individual CDRs.  Of particular interest for purposes of these Motions, the .TXT files contain information about project account codes ("PACs") entered by the customer for a particular call.  Dkt. No. 881 at 6 ¶ 19.  PACs, which were used by Qwest and its customers prior to eBC's introduction, are set up on request for Qwest customers and allow codes corresponding to particular employees, types of calls, or offices.  *Id.* at 7 ¶ 20.  A customer using PACs enters the relevant PAC in addition to dialing the relevant telephone number, and data specifying the PAC entered becomes part of the CDR for that call.  *Id.* at 6 ¶ 19.  In the .TXT files created by eBC Back Office, PACs are included for calls on which they are used.  *Id.*  For calls made without using PACs, the .TXT file includes a null PAC value.  *Id.*

For delivery to customers, these .TXT files are combined with .FMT files manually created by Qwest personnel.  Dkt. No. 892 at 4 ¶ 6.  The .FMT files, along with aspects of the eBC customer portal, provide the schema for organizing the .TXT files.  Dkt. No. 873-4 at 4.  All customers receiving billing data through eBC receive the same .FMT files.  *Id.*  In order to use the billing data in the eBC system, a customer must receive both the relevant .TXT and .FMT files.  *Id.*

Qwest's customers can request to receive their billing information either on CD-ROM or by download through the Qwest Control portal.  Dkt. No. 872-10 at 12.  The billing information, sent to the requesting customer as a .zip file, includes the relevant .TXT and .FMT files configured for use in the eBC customer application.  *See generally* dkt. no. 873-8.  Qwest does not require that customers receiving this billing information use the eBC

6

application, and the files may be used by third party applications.  Dkt. No. 884 at 13 ¶ 8.

Requesting customers receive their billing information at the end of each billing cycle.  Dkt.

No. 872-10 at 12.  Using the On-Demand feature of eBC, however, customers can request

billing information for a particular previous time period.  Dkt. No. 881 at 8 ¶ 23.


## C.  PROCEDURAL HISTORY

On January 12, 2004, Centillion brought suit against Qwest in this Court.  Dkt. No.

1.  On February 14, 2005, the suit was consolidated with a related suit by Qwest against

Centillion, originally filed in the United States District Court for the Western District of

Washington and transferred to this Court, seeking a declaratory judgment of non-

infringement or invalidity of the '270 Patent.  *See* dkt. no. 174.

On January 9, 2008, following briefing and argument, the Court issued its Order on

Claim Construction ("*Markman* Order").  The Court construed the disputed claim terms as

follows:

| CLAIM TERM | CONSTRUCTION |
|---|---|
| "actual cost" | not a claim limitation |
| "exact charges actually billed" | the rated cost assigned to each individual transaction record |
| "means for storing" | a device capable of receiving, retaining, and supplying data |

| "data processing means" | functions: (1) generating preprocessed summary reports; and (2) organizing said summary reports into a format for storage manipulation and display on a personal computer data processing means<br><br>structure: a computer that is programmed to segregate data by customer and record type, to edit and accumulate data to produce reports, to create database tables and additional records for storage, and to convert data, and its equivalents |
| --- | --- |
| "as specified by the user" | the service customer selects, or makes specific, the character of |
| "means for transferring" | functions: (1) transferring at least part of said individual transaction records from said storage means to said data processing means; and (2) transferring said individual transaction records including said summary reports to said personal computing data processing means<br><br>structure: magnetic tape, disk, or data communication lines, or their equivalents |
| "additional processing" | more action upon or further manipulating |
| "individual transaction records" | records of discrete events |

Dkt. No. 394 at 46.

On October 29, 2009, based on the claim construction set forth in the *Markman* Order and extensive briefing from the parties, the Court issued its Amended Order on summary judgment. *See generally* dkt. no. 828. The Court concluded that the '270 Patent is valid, having not been rendered obvious by previously issued patents. *Id.* at 31. The Court further concluded that Qwest was not liable for direct infringement because it neither operated all potentially infringing aspects of the Accused Products nor directed its customers to use the Accused Products in an infringing manner. *Id.* at 34. Because it concluded that there was no underlying act of direct infringement, the Court concluded that

8

Qwest could not be held liable for indirect infringement. *Id.*

Centillion appealed the Court's conclusion of non-infringement to the Federal Circuit. Dkt. No. 852 at 3. On May 2, 2011, the Federal Circuit issued an Order vacating in part, reversing in part, and remanding the case back to this Court. *See generally Centillion*, 631 F.3d 1279. The Federal Circuit concluded that Qwest did not engage in direct infringement. *Id.* at 1286. However, it further concluded that the standard operation of the Accused Products by Qwest's customers constitutes "use" for a direct infringement analysis, although it acknowledged that the "use" determination was not a complete finding of infringement, as no comparison of the Accused Products and the claim limitations had occurred. *Id.* at 1285. It remanded the case to this Court for a determination as to whether Qwest could be held liable for indirect infringement based on its customers' use of the Accused Products. *Id.* at 1286.

Following remand, the parties filed the present Motions. Centillion requests a finding that Qwest indirectly infringed Claims 1 and 8 of the '270 Patent by providing the eBC application to customers and instructing them as to its use in an infringing manner. Dkt. No. 872 at 41. Qwest requests a finding of non-infringement as to the entirety of the '270 Patent, contending that the Accused Products do not meet all the claim limitations of the '270 Patent and, alternatively, Qwest did not have the requisite *mens rea* for indirect infringement. Dkt. No. 884 at 6–7. Since filing the Motions, the parties have filed a number of supplemental materials. *See generally* dkt. nos. 886, 889, 898, 901, 903, 905, 914–15, 920, 922–26.

The Court includes additional facts below as necessary.

## II.  STANDARDS

### A.  SUMMARY JUDGMENT

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990).   Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a material fact is genuinely disputed.  FED. R. CIV. P. 56(c)(1).  A genuine dispute of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine dispute of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

10

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## B.  PATENT INFRINGEMENT

Under 35 U.S.C. § 271(a) , "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . within the United States . . . infringes the patent." Reviewing whether a particular device or system infringes a patent is a two-step process. *See CAE Screenplates v. Heinrich Fiedler GMBH*, 224 F.3d 1308, 1316 (Fed. Cir. 2000); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999). First, the Court must interpret the disputed claims, "from a study of all relevant documents," to determine their

11

scope and meaning.  *K-2 Corp.*, 191 F.3d at 1362; *see also Dolly, Inc. v. Spalding &*
*Evenflo Cos., Inc.*, 16 F.3d 394, 397 (Fed. Cir. 1994).  Second, the Court must determine
if the accused device, system, or process comes within the scope of the properly construed
claims, either literally or by a substantial equivalent.  *See K-2 Corp.*, 191 F.3d at 1362;
*Dolly*, 16 F.3d at 397; *SmithKline Diagnostics v. Helena Labs. Corp.*, 859 F.2d 878, 889
(Fed. Cir. 1988).   In this case, the first phase of the infringement analysis, claim
construction, occurred prior to the instant Motions.  *See* dkt. no. 394.  Therefore, the
Court's analysis focuses on the second phase of the infringement analysis.

The patent owner bears the burden of proving infringement.  *Dynacore Holdings*
*Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004).  The Federal Circuit has
found in this case that Qwest did not engage in direct infringement, either on its own or
through vicarious liability for any infringing acts by its customers.  *See Centillion*, 631 F.3d
at 1286.  The present Motions, therefore, address indirect infringement only.  There are two
types of indirect infringement: contributory infringement and inducement to infringe.  Both
types of indirect infringement require an underlying act of direct infringement.  *Akamai*
*Techs., Inc. v. Limelight Networks, Inc.*, Nos. 2009-1372, -1380, -1416–17, 2012 WL
3764695, at *4 (Fed. Cir. Aug. 31, 2012) (per curiam) (citing *Deepsouth Packing Co. v.*
*Laitram Corp.*, 406 U.S. 518, 526 (1972); *Aro Mfg. Co. v. Convertible Top Replacement*
*Co.*, 365 U.S. 336, 341 (1961); *Henry v. A.B. Dick Co.*, 224 U.S. 1, 12 (1912)).

### III.  DISCUSSION

As an initial matter, the parties disagree as to whether Centillion previously
conceded that Qwest's customers must use Qwest's client software to directly infringe, as

12

opposed to inputting data received from Qwest into a third-party application with similar functionality.  In its opinion, the Federal Circuit noted in dicta that "Centillion concedes that in order to infringe, the customer must install Qwest's client software."  *Centillion*, 631 F.3d at 1286 n.2.  Centillion contends that it made no such concession and maintains that infringement may be found even if customers process records sent from Qwest using a third-party application rather than Qwest's software.  However, a review of Centillion's appellate brief convinces the Court that Centillion made such a concession.  Dkt. No. 883-1 at 5 ("Only if the installation of the eBill Companion client application, the downloading of call data, and its importation into the eBC client application are completed according to Qwest's step-by-step directions are the customers' personal computers 'adapted to perform additional processing' as set forth in the claims.").  Centillion may not revoke an admission made before the Court of Appeals on remand to this Court.    *See United States v. Cunningham*, 405 F.3d 497, 503–04 (7th Cir. 2005) (concession made in appellate brief binding on party).  Therefore, the Court limits Centillion's claims to customers purportedly using Qwest's application, rather than a third-party application, to process records and proceeds accordingly.

## A.  DIRECT INFRINGEMENT

To prove direct infringement, Centillion must show by a preponderance of the evidence that every limitation of the claim asserted to be infringed has been found in the accused device, either literally or by equivalent.  *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).  For terms construed as "means-plus-function" terms, infringement "requires that the relevant structure in the accused device

perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006) (citing *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003)).   A party may prove direct infringement by circumstantial evidence. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009).

As the parties agree, and the Federal Circuit concluded, that Qwest did not directly infringe the '270 Patent, Centillion must show that direct infringement occurred through Qwest's customers' use of the Accused Products.[3]   The Federal Circuit concluded that Qwest's customers "use" the Accused Products as a matter of law, but the Court noted that this finding did not conclude the direct infringement inquiry. *Centillion*, 631 F.3d at 1285–86.  The Court must still determine whether the Accused Products meet all limitations of the claim terms. *Cross Med. Prods.*, 424 F.3d at 1310.  In this type of direct infringement analysis, where the steps allegedly constituting infringement are performed sequentially by numerous non-related actors, rather than a single company or actor, it must be shown that

---

[3]  In one of its supplemental authority submissions, Centillion contends that the Federal Circuit en banc decision in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, No. 2009-1372, 2012 WL 3764695 (Fed. Cir. Aug. 31, 2012) (per curiam), undermines the Federal Circuit's previous statement in this litigation that "Qwest does not 'make' the patented invention . . . as a matter of law." *See Centillion*, 631 F.3d at 1288.  Centillion argues that it should be permitted to argue that Qwest is a direct infringer through "making" the patented invention. *See generally* dkt. no. 922.

Having reviewed *Akamai* and the Federal Circuit's decision in this case, the Court concludes that *Akamai* does not require reevaluation of the Federal Circuit's finding.  *Akamai* states that "the party that adds the final element to the combination 'makes' the infringing product and is thus liable for direct infringement even if others make portions of the product."  2012 WL 3764695, at *11.  In this case, there is little doubt that Qwest's customers complete the system by installing and using the Accused Product on their PCs—in other words, the final element is added by the customer, not Qwest.  *Akamai* does not control clearly enough to justify deviation from the Federal Circuit's clear statement that Qwest is not a direct infringer under either the "use" or "make" standard.  *See Centillion*, 631 F.3d at 1288.

Although Qwest still may be held liable as an indirect infringer if Qwest's customers are found to be direct infringers and other legal criteria are met, the Federal Circuit's decision as to Qwest's status as a direct infringer is the law of the case and will be upheld as such.

eBC meets all the claim limitations when fully operated and that eBC was indeed operated

as such.  *Cf. Akamai Techs.*, 2012 WL 3764695, at *4–*5.


## 1.  CLAIM 1

The parties agree that eBC encompasses all of the following elements of Claim 1:

A system for presenting information concerning the actual cost of a service provided to a user by a service provider, said system comprising:

storage means for storing individual transaction records prepared by said service provider, said transaction records relating to individual service transactions for one or more service customers including said user, and the exact charges actually billed to said user by said service provider for each said service transaction;

data processing means comprising respective computation hardware means and respective software programming means for directing the activities of said computation hardware means;

means for transferring at least a part of said individual transaction records from said storage means to said data processing means;

. . . .

means for transferring said individual transaction records . . . from said data processing means to said personal computer data processing means . . . .

'270 Patent col.31 ll. 39–55, 63–66.  In other words, elements one, two, three, and four of

Claim 1, as well as a portion of element six, are present in eBC.  *See generally* dkt. no.

872; *see also* dkt. no. 889 at 9.

However, Qwest contends that eBC does not meet the other elements of Claim 1.

Specifically, Qwest contends that Centillion has not proven that any of Qwest's customers

use eBC in a manner that satisfies the "as specified by the user" limitation of element five

of Claim 1.  *See* '270 Patent col.31 l.57.  In addition, Qwest contends that the data

15

processing means of eBC does not generate "summary reports," "create database tables," "edit data," or "segregate data . . . by record type" as required by elements five, six, and seven—*see id.* at col.31 ll. 57, 64; col.32 l. 3—as well as the Court's construction of the means-plus-function limitations of the "data processing means" term.  *See* dkt. no. 394 at 31.  The Court addresses these contentions in turn.

### a.  *"as specified by the user"*

The fifth element of Claim 1 requires "said data processing means generating preprocessed summary reports as specified by the user from said individual transaction records transferred from said storage means and organizing said summary reports into a format for storage, manipulation and display on a personal computer data processing means[.]" '270 Patent col.31 ll. 56–62.  In the *Markman* Order, the Court construed "as specified by the user" to mean "the service the customer selects, or makes specific, the character of."  Dkt. No. 394 at 34.  Centillion contends that eBC meets the "as specified by the user" limitation through its use of PACs and its On-Demand functionality, as well as customizations to the .TXT files made in response to requests by particular customers.

The Court concludes that inclusion of PACs in customer's billing information does not meet the "as specified by the user" limitation of the fifth element of Claim 1.  Qwest's customers use of PACs is configured completely outside of the eBC framework, and PACs may be used by customers regardless of whether they analyze billing records with eBC, with a third-party application, or not at all.  Dkt. No. 881 at 7 ¶ 20.  Customers may enter a PAC when placing a call, but they are not required to do so, and a section for PACs is included in the billing information provided by Qwest in conjunction with eBC even if

16

customers choose not to enter a PAC.  Dkt. No. 891-2 at 15–16.  Inclusion of PACs in the billing information generated by Qwest is no different than inclusion of the telephone number dialed, a mere piece of data, and there is little doubt that dialing a particular telephone number does not satisfy the "as specified by the user" limitation.  In short, the Court concludes that use of PACs does not meet the "as specified by the user" limitation.

In addition, the Court concludes that Qwest did not perform customization for particular customers so as to meet the "as specified by the user" limitation.  Centillion contends that changes made to the .TXT files in response to customer feedback, such as from Wells Fargo, meet the "as specified by the user" limitation.  However, Centillion concedes that customers who have had their data files customized cannot use the eBC client application software.  Dkt. No. 884 at 19;  dkt. no. 886 at 13 n.10.  As discussed above, Centillion has already conceded that infringement requires use of the eBC client application software.  Therefore, the Court concludes that any "customization" alleged by Centillion does not meet the "as specified by the user" limitation of Claim 1.

However, the Court concludes that use of the On-Demand feature does meet the "as specified by the user" limitation.  On-Demand allows a customer to submit a request to receive billing information for a particular previous billing cycle.  Dkt. No. 881 at 7 ¶ 22.  In doing this, the customer "selects . . . the character of" the information being provided, specifying that the information cover only a particular time period.  Qwest argues that because the time period selected is limited by billing cycle—in other words, a customer cannot request just any time period, but instead the time period requested must correspond to a billing cycle—the "as specified by the user" limitation is not met.  However, "as specified by the user" does not require as much flexibility as Qwest would like, and it is

17

sufficient that the customer may select a subset of available time ranges, even if that selection must correspond to a particular billing cycle.

Having determined that use of the On-Demand feature meets the "as specified by the user" limitation, the Court still must determine what evidence is necessary to show this element. Qwest contends that Centillion must bring forth evidence of specific customers that specified the character of the data and reports they were receiving, above and beyond evidence that the On-Demand feature provides the capacity to allow customers to make those selections. Centillion contends that the Court's claim construction of "data processing means" in conjunction with "as specified by the user" renders the limitation one of capability, not actual operability.

Examining the language of the claims, the Court concludes that mere capacity is insufficient. The fifth element of Claim 1 speaks of a "data processing means generating . . . reports as specified by the user," language that speaks of the data processing means taking some sort of action to bring the reports into existence. However, Qwest's contention that Centillion must bring forth evidence such as customer deposition testimony of use of the On-Demand feature asks too much, as Centillion may prove that the feature was used through circumstantial evidence. *Vita-Mix Corp.*, 581 F.3d at 1326. Reviewing the evidence, the Court concludes a genuine dispute of material fact exists as to whether at least one of Qwest's customers used the On Demand feature. For instance, Nick Bates of MedQuist, Inc. sent a complaint to Qwest's help desk stating, "I am trying to download On-Demand files, I receive the emails that state that they are completed, but they do not appear on the website for me. A co-worker of mine has no problem with this feature." Dkt. No. 886-9 at 3. Contrary to Qwest's argument, this is more than the descriptions in the

18

user's manual found insufficient by the Federal Circuit in *Mirror Worlds*.  *See Mirror Worlds, LLC v. Apple, Inc.*, No. 2011-1392, 2012 WL 3800812, at *8–*9 (Fed. Cir. Sept. 4, 2012). The Court concludes that use of the On-Demand feature meets the "as specified by the user" limitation of Claim 1 and that there is a factual dispute as to whether Qwest's customers actively used the feature.

### b.  Means-plus-function construal of "data processing means"

Qwest contends that eBC does not have a "data processing means" as that term was construed in the *Markman* Order.  Centillion contends that eBC Back Office, LATIS, or a combination thereof is a "data processing means" as defined by the Court.  The Court construed "data processing means" as a means-plus-function term under 35 U.S.C. § 112, ¶ 6.  Specifically, the Court concluded that data processing means performs the functions of (1) generating preprocessed summary reports and (2) organizing said summary reports into a format for storage manipulation and display on a personal computer data processing means.  Dkt. No. 394 at 31.  The structure corresponding to these functions was construed as "a computer that is programmed to segregate data by customer and record type, to edit and accumulate data to produce reports, to create database tables and additional records for storage, and to convert data into a PC-compatible format and its equivalents."  *Id.*  As noted above, infringement of a means-plus-function term "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification."  *Applied Med. Res. Corp.*, 448 F.3d at 1333.  Equivalence in structure may be proven "by showing that [] two [structures] perform the identical function in substantially the same way, with

19

substantially the same result."  *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000).

Examining the required functions of the data processing means, the Court concludes that the eBC Back Office and LATIS, or a combination thereof, generates preprocessed summary reports as required by the claims.  In the *Markman* Order, the Court defined "summary report" as "a collection of analyzed and/or reorganized data."  Dkt. No. 394 at 41.  The Court left open the possibility that a report including all billing information for a particular customer would constitute a summary report and did not place any limitation on the format of the summary report.  *Id.*  The eBC Back Office organizes the billing information by customer and inserts that information into various .TXT files, although viewing of these .TXT files requires additional .FMT files constructed by Qwest personnel outside of the eBC framework.  Dkt. No. 892 at 4 ¶ 6.  These .TXT files, even apart from the .FMT files, are sufficient to constitute summary reports as that term has been construed, as they include "a collection of . . . reorganized data."  Centillion has brought forth evidence that at least some of Qwest's customers receive their billing information and use it in eBC—in other words, at least some of Qwest's customers receive the .TXT files, preprocessed summary reports.  *See, e.g.*, dkt. no. 872 at 18 ¶ 27.  Therefore, the Court concludes that eBC Back Office generates a preprocessed summary report.

Turning to the other required function of the data processing means, however, the Court concludes that eBC Back Office, LATIS, or a combination thereof, does not "organiz[e] said summary reports into a format for storage manipulation and display on a personal computer data processing means."  *See* dkt. no. 394 at 31.  Although LATIS and eBC Back Office perform the steps necessary to create a summary report—the relevant

.TXT file—neither of those systems organize the summary reports into a format for display on a personal computer. Instead, the customer must be provided with a .FMT file and schema within the eBC client application to interact with the .TXT file and allow display of the summary reports on a personal computer. Dkt. No. 892 at 4 ¶ 6. The .FMT file is generated by Qwest personnel apart from either LATIS or eBC Back Office. *Id.* Neither LATIS nor eBC Back Office—the alleged data processing means—performs the steps necessary to format the .TXT file for display. Because Centillion has not brought forth evidence that the so-called data processing means "organiz[e] . . . summary reports into a format for . . . display," the Court concludes that eBC fails to perform a required function of the data processing means and, therefore, fails to meet all limitations of Claim 1.

As noted above, direct infringement requires that every limitation of the claim asserted to be infringed has been found in the accused device, either literally or by equivalent. *Cross Med. Prods.*, 424 F.3d at 1310. For means-plus-function limitations, the relevant structure must "perform the identical function recited in the claim." *Applied Med. Res. Corp.*, 448 F.3d at 1333. Because the Court concludes that the data processing means of eBC does not perform all required functions set forth in the limitations of Claim 1, the Court concludes that eBC does not infringe Claim 1 of the '270 Patent.

<u>2. CLAIM 8</u>

Claim 8 tracks Claim 1 specifying operation by "telecommunications service providers" and involving "telecommunication usage records." *See generally* '270 Patent col. 32 ll. 30–46. As the parties do not dispute that Qwest is a "telecommunications service provider" and any records distributed by Qwest are "telecommunication usage records," the

21

direct infringement analysis for Claim 8 is identical to the analysis for Claim 1.  *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1371 (Fed. Cir. 2003) (requiring identical construction of identical claim terms).  Because, as discussed above, eBC does not infringe all limitations of Claim 1, and the relevant limitations of Claim 8 contain identical claim terms, the Court concludes that eBC does not infringe Claim 8 of the '270 Patent.[4]

## B.  INDIRECT INFRINGEMENT

In order for Qwest to be held liable for indirect infringement—either contributory infringement or inducement of infringement—an underlying act of direct infringement, in this case committed by Qwest's customers, must be shown.  *Akamai Techs.*, Nos. 2009-1372, -1380, -1416–17, 2012 WL 3764695, at *4 (citing *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526 (1972); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961); *Henry v. A.B. Dick Co.*, 224 U.S. 1, 12 (1912)); *see also Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012).  As discussed above, eBC fails to meet all claim limitations of the '270 Patent and, therefore, no direct infringement has occurred.  Consequently, Qwest cannot be held liable for indirect infringement[5] and is entitled to summary judgment.

---

[4] As Claims 10 and 46 of the '270 Patent are dependent claims based on Claim 8, the Court concludes that eBC does not infringe those Claims either.

[5] Because Centillion has not shown that direct infringement has occurred, the Court declines to address whether Qwest had the requisite mens rea to indirectly infringe the '270 Patent.

## IV.  CONCLUSION

For the reasons set forth herein, the Court rules as follows:

1)   Plaintiffs Centillion Data Systems, LLC's and CTI Group (Holdings) Inc.'s Motion for Partial Summary Judgment of Infringement [Dkt. No. 871] is **DENIED**.

2)   Defendants Qwest Communications International, Inc. and Qwest Corporation, and Consolidated Plaintiffs Qwest Corporation and Qwest Communications Corporation's Motion for Summary Judgment of Non-Infringement [Dkt. No. 880] is **GRANTED**.

3)   Plaintiffs Centillion Data Systems, LLC's and CTI Group (Holdings), Inc.'s Request for Oral Argument on Their Motion for Partial Summary Judgment of Infringement [Dkt. No. 879] is **DENIED**.

4)   Qwest's Motion for Leave to File a Sur-Reply to Centillion's Reply in Support of Its Notice of Supplemental Authority [Dkt. No. 918] is **DENIED**.

5)   Centillion's Renewed Motion for Oral Argument on Motions for Summary Judgment [Dkt. No. 921] is **DENIED**.

IT IS SO ORDERED this 28th day of September, 2012.


_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution attached.

23

Distribution to:

Vincent J. Belusko
MORRISON & FOERSTER LLP
vbelusko@mofo.com

J. Manena Bishop
MORRISON & FOERSTER (L.A.)
mbishop@mofo.com

Kenneth L. Bressler
BLANK ROME, LLP
kbressler@blankrome.com

Dale  Buxton II
MORRISON & FOERSTER, LLP
dbuxton@mofo.com

David C. Campbell
BINGHAM GREENEBAUM DOLL LLP
dcampbell@bgdlegal.com

Phillip J. Fowler
BINGHAM GREENEBAUM DOLL LLP
pfowler@bgdlegal.com

Alan M. Freeman
BLANK ROME LLP
freeman@blankrome.com

Hector G. Gallegos
MORRISON & FOERSTER LLP
hgallegos@mofo.com

Paul M. Honigberg
BLANK ROME LLP
honigberg@blankrome.com

James W. Riley Jr.
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

Victor M. Wigman
BLANK ROME LLP
wigman@blankrome.com